**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : |
| v. | :    CRIMINAL NO.  2:23-cr-00505 |
| | : |
| DAVID OTERO-LUGO | : |

---

**MEMORANDUM OPINION**

**GALLAGHER, J.**                                              **August 9, 2024**

Defendant David Otero-Lugo, charged by a federal grand jury with attempted possession with intent to distribute 500 grams or more of cocaine, in violation of Title 21, United States Code, Sections 846, 841(a)(1), 841(b)(1)(B), seeks to suppress evidence obtained in a search of his apartment pursuant to an anticipatory warrant. He contends the original seizure of the subject package was conducted without reasonable suspicion, the Government searched the package without probable cause, the investigatory sniff of the drug detection K9 was an unconstitutional search, and the anticipatory warrant violated the Fourth Amendment's particularity requirement and the affidavit lacked probable cause. The Government contends Defendant lacks standing to challenge the search, the seizure was supported by reasonable suspicion, the Government had probable cause to search the package, the investigatory sniff by the K9 was not a search pursuant to the Fourth Amendment, and the anticipatory warrant did not violate the Fourth Amendment. For the following reasons, the Court denies Defendant's Motions to Suppress.

## I.      BACKGROUND

In August 2023, Drug Enforcement Administration Special Agent Nick DiFrancesco contacted United States Postal Inspector Matthew Lynch, regarding an investigation of Defendant

Otero-Lugo trafficking cocaine through the United States mail.[1] Suppression Hr'g Tr., May 14,

2024 at 16:1-8, 24:14-21. Agent DiFrancesco provided Inspector Lynch with approximately five

addresses subject to investigation, which led Inspector Lynch to place mail watches on the

provided addresses. *Id.* at 25:3-18. The mail watches notified Inspector Lynch via email of all

inbound packages. *Id.* One of the addresses, 4515 Whitaker, stood out to Inspector Lynch, as he

seized a parcel containing three kilograms of cocaine destined for that location the month prior to

the instant investigation. *Id.* at 25:25, 26:1-13.

On October 31, 2023, Inspector Lynch received an alert that there was an inbound package

for one of the addresses provided by Agent DiFrancesco, 3346 Tyson Ave. *Id.* at 27:2-5. The alert

revealed that the package was 13 pounds and was inbound to Philadelphia from Puerto Rico. *Id.*

at 28:3-17. The alert also revealed that the parcel was shipped Priority Mail. *Id.* at 29:4-6. These

details were significant to Inspector Lynch because he was aware that Puerto Rico is a source

---

[1]     Employed by the United States Postal Inspection Service since 2017, Inspector Lynch is
an experienced investigator with duties and responsibilities including investigating individuals and
organizations that utilize the United States Postal Service in furtherance of trafficking narcotics,
including the illegal transportation of controlled substances and drug trafficking within the United
States Postal Service. Suppression Hr'g Tr., May 14, 2024, at 13:1-25, 14:1-23; Parcel Warrant,
Gov't Ex. 2 at 1. He has undergone on on-the-job training and training with the United States
Postal Inspection Service Academy in Potomac, Maryland. *Id.* at 13:23-25. Throughout his career,
he has intercepted several hundred packages from the mail stream and applied for search warrants
on approximately 100 to 200 occasions. *Id.* at 14:9-17. In over 90 percent of those instances, drugs
were discovered in the packages. *Id.* at 14:18-23. Additionally, during his time as a police officer,
he participated in package investigations. *Id.* at 15:2-13. Through this background, he is
knowledgeable of the inner workings of parcel delivery services. *See* Gov't Ex. 2 at 1.
        Based on his training and experience, Inspector Lynch is aware that: (1) parcel delivery
services offer traffickers rapid and dependable service for most metropolitan areas,  (2) these
parcels guarantee delivery within the specified number of days, with a refund if the parcel does
not meet the service standards, (3) parcels delayed beyond the normal delivery time serve to alert
the recipient that the authorities may have discovered the controlled substances, (4) parcel delivery
services use assigned label numbers, which make it easy for the parcels to be tracked, (5) the sender
is given an estimated date of delivery and the weight of the parcel, and (6) traffickers use parcel
services to transport their product and/or proceeds because it is relatively anonymous, secure, and
fast. *Id.* at 1-2.

location for controlled substances, and he had seen packages of the same weight contain narcotics. *Id.* at 28:11-17, 25, 29:1-3. Additionally, based on his experience, Inspector Lynch knew that individuals involved in trafficking narcotics use package tracking, such as that provided by Priority Mail packages, as a security measure, as a delay in delivery could alert them to the involvement of law enforcement. *Id.* at 29:9-18–31:4.

After receiving this information, Inspector Lynch placed further alerts on the parcel which provided text message updates regarding when and where the parcel was in the mail stream. *Id.* at 27:12-18. Early in the morning on November 1, 2023, Inspector Lynch received a text alert informing the parcel was in Philadelphia. *Id.* at 27:20-22. Thereafter, Inspector Lynch contacted Postal Police and asked them to detain the parcel. *Id.* at 31:23-25, 32:1. The parcel was detained before the labels were seen by Inspector Lynch. *Id.* at 60:22-24.

Later that same day, Inspector Lynch went to the Lindbergh Processing Facility and retrieved the parcel. *Id.* at 32:7-9. From the parcel label, Inspector Lynch learned the parcel was mailed on October 30, 2023, from Camuy, Puerto Rico with an expected delivery date to the recipient address of November 3, 2023. *Id.* at 17:19-23, 18:21-23.

The parcel had the following characteristics:

| | |
|---|---|
| Priority Mail No.: | 9505 5106 3998 3303 7577 85 |
| Measuring approx.: | 12" x 12" x 8.5" |
| Weighing approx.: | 13 pounds, 6.4 ounces |
| | |
| Return Address: | Winny Garcia Entencion |
| | Villa Del Carmen D-58 |
| | Camuy PR 00627 5 |
| | |
| Delivery Address: | Virginia Garcia |
| | 3346 Tyson Ave |
| | Phia [*sic*], PA 19149 |

The parcel also bore a barcode with a tracking number. *Id.* at 19:6-9; Parcel Photograph, Gov't Ex. 1.

After retrieving the package, Inspector Lynch began his investigation through a Postal Service database and the law enforcement database CLEAR.[2] Suppression Hr'g Tr., May 14, 2024, at 32:18-25, 33:1-2. He learned that the names "Winny Garcia Entencion" and "Virginia Garcia" did not bear any association to the respective addresses. *Id.* Based on his training and experience, Inspector Lynch knew that drug traffickers who use the mail or package delivery services often use fictitious sender and/or recipient names and fictitious or partial sender addresses (sometimes with zip codes different than the shipping Post Office to mask drug trafficking operations).[3] Parcel Warrant, Gov't Ex. 2, at 3.[4] Therefore, Inspector Lynch believed this was an attempt to avoid detection by law enforcement and the parcel may contain illegal narcotics. Suppression Hr'g Tr., May 14, 2024, at 34:3-4; Gov't Ex. 2, at 3.

Subsequently, Inspector Lynch contacted a narcotics detection K9 handler, Special Agent Bob Weber from the Pennsylvania Attorney General's Office.[5] *Id.* at 35:14-27. On November 1,

---

[2]     The CLEAR database aggregates public records, such as voter registration, credit cards, deeds, and leases. Suppression Hr'g Tr., May 14, 2024, at 66:7-10.

[3]     The Court acknowledges there are a myriad of explanations other than criminal activity as to why a person may not be found in CLEAR, including, by broad example, because that individual is not registered to vote, does not have a formal lease, does not have a credit card, or is a minor. *Id.* at 66:11-25, 67:1-2. However, this information can still be a factor in the totality of the circumstances. Police officers are not required to explain away possible "legitimate" explanations. *Martinsky v. City of Bridgeport*, 504 Fed. Appx. 43, 46 (2d Cir. 2012) ("police officers are not required conclusively to eliminate all alternative explanations offered by a subject where the evidence reasonably indicates that the suspect may have committed a crime.").

[4]     The exhibit page citations correspond to the document page number, not the exhibit page.

[5]     Agent Weber has worked with the Pennsylvania Attorney General's Office since 1999 and has been a K9 handler since 2017. Gov't Ex. 2, at 3-4. The Pennsylvania Attorney General's Office certifies Agent Weber and his drug detection K9 named "Mizu" annually. *Id.* Agent Weber and K9 Mizu undergo eight-hour maintenance training every month. *Id.* In October 2023, Agent Weber and K9 Mizu successfully completed the United States Police K9 Association Certifications and are now certified in the detection of the following substances: Marijuana/Hashish, Cocaine hydrochloride/Cocaine base, Heroin Hydrochloride, PCP, Methamphetamine, Fentanyl, Oxycodone, LSD, and MDMA. *Id.*

2023, Agent Weber brought K9 Mizu to Inspector Lynch's office, located in Bala Cynwyd, and set up a line of four blank parcels along with the subject parcel outside of the dog's view. *Id.* at 36:4-25. The dog was then brought into the area where Agent Weber set up the packages, sniffed each parcel, and sat down next to the subject parcel. *Id.* This process was then repeated after the subject parcel was moved to a different position. The dog again sniffed each one and again sat down next to the subject parcel. *Id.* at 37:1-8. Agent Weber then notified Inspector Lynch that the dog alerted positively to the presence of illegal substances. *Id.* at 37:12-13.

Later that same day, Inspector Lynch applied for a warrant to search the parcel. *Id.* at 38:9; Gov't Ex. 2. The warrant affidavit detailed the training and experience of Agent Weber and K9 Mizu and informed that Mizu alerted positively to the presence of a controlled substance inside the parcel. *See* Gov't Ex. 2. United States Magistrate Judge Craig M. Straw issued a federal search warrant to search the parcel. Suppression Hr'g Tr., May 14, 2024 at 38:13-14; Gov't Ex. 2. Upon opening the parcel, Inspector Lynch discovered a mini fridge with three brick shaped objects. Suppression Hr'g Tr., May 14, 2024 at 38:20-22. Inspector Lynch performed a field test, and each brick tested positive for the presence of cocaine. *Id.* They were submitted to a laboratory for further analysis, which revealed they contained slightly over three kilograms of cocaine. *Id.* at 39:3-13.

On November 2, 2023, Inspector Lynch applied for an anticipatory search warrant to conduct a controlled delivery at 3346 Tyson Ave. and a warrant to install a GPS tracking device inside the parcel. *Id.* at 43:6-19; Anticipatory Warrant, Gov't Ex. 3. The anticipatory warrant was approved and authorized the search of 3346 Tyson Avenue, Philadelphia, PA 19149, or any other location that the parcel was brought. Gov't Ex. 3 at 5 ¶ 12. The parcel was required to enter "the location" as a condition precedent to law enforcement searching the location. Suppression Hr'g Tr., May 14, 2024 at 41:23-25–42:1-3. Inspector Lynch placed sham cocaine in the package, along

5

with a small sample of actual cocaine, a GPS tracking device, and a beeper. *Id.* at 41:9-16. Prior to resealing the parcel, he coated the contents with theft detection powder. *Id.* at 41:15-16. The GPS device that Inspector Lynch placed inside the parcel allowed him to determine whether the package was brought into a specific location. *Id.* at 42:4-7. Further, the beeper alerted him when the mini fridge inside the parcel had been opened. *Id.* at 42:8-18; Gov't Ex. 3.

On November 2, 2023, Inspector Lynch, along with other agents, set up surveillance around 3346 Tyson Ave. Suppression Hr'g Tr., May 14, 2024, at 44:2-12. An undercover Postal Inspector, posing as a letter carrier, delivered the parcel at approximately 10:49 a.m. *Id.* After the parcel was delivered, and during the agent surveillance, the agents observed an individual walk onto the porch of the residence, step over the parcel, and enter the residence without disturbing the parcel. *Id.* at 45:1-5.

At approximately 1:40 p.m., Defendant arrived at the premises in a red four door sedan. *Id.* at 45:10-14. Upon exiting the vehicle, he approached the premises, removed the parcel, and placed it in the trunk of his vehicle. *Id.* After a brief stop at the Wawa located at the intersection of Tyson and Roosevelt Boulevard, where Defendant met a female individual, Defendant left the area. *Id.* at 46:24-25, 47:1-3.

Inspector Lynch subsequently interviewed the female whom Defendant met at the Wawa. *Id.* at 72:12-15. She informed him that Defendant paid her $400 cash to ship the parcel to her address. *Id.* at 72:16-20. She also stated that Defendant sent parcels to that location for ten months. *Id.* at 59:7-13. Inspector Lynch estimated the subject parcel to be the fourth that Defendant sent to this address. *Id.* at 73:14-16. No other connection between Defendant and the Tyson Ave. address was determined from the investigation. *Id.* at 72:22-24.

6

After leaving the Wawa, agents followed Defendant to his apartment building located at 5450 Wissahickon Avenue, where Inspector Lynch observed him remove the parcel from the trunk of his vehicle and bring it into the building. *Id.* at 52:4-12. Agents who were stationed inside the building observed Defendant enter apartment 137, which Inspector Lynch knew Defendant leased, with a key.[6] *Id.* at 46:6-23, 48:4-20.

Approximately five minutes after Defendant entered his apartment, Inspector Lynch received an alert on the beeper transmitter reporting that the mini fridge was opened. *Id.* at 49:1-3. The agents then approached apartment 137, knocked and announced their presence, and breached the door after Defendant failed to answer. *Id.* at 49:7-20. Agents observed Defendant standing by the bed in the center of the apartment next to the opened parcel. *Id.* at 52:17-21. Agents detained him and conducted a search of the apartment pursuant to the warrant. *Id.* at 53:11-21. The mini fridge was located on top of the bed, and its contents were found behind a dresser. *Id.* at 52:17-21, 53:1-2. Inspector Lynch utilized an ultraviolet light to observe the theft detection powder on Defendant's hands. *Id.* at 53:14-16. A full search of Defendant's apartment led to the recovery of $2,000, a money counter, money banding supplies, a food saver, a vacuum sealer, vacuum sealing bags, and scales. *Id.* at 53:24-25, 54:2-2.

## II.    DISCUSSION

### A.    Burden of Proof

"As a general rule," in a suppression motion, "[t]he burden of proof is on the defendant who seeks to suppress evidence." *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995); *see also Rawlings v. Ky.*, 448 U.S. 98, 104 (1980) (establishing burden of proving standing is also on

---

[6]     Inspector Lynch obtained a copy of Defendant's lease prior to November 2, 2023. Suppression Hr'g Tr., May 14, 2024, at 46:15-20.

defendant). "However, once the defendant has established a basis for his motion[s]… the burden shifts to the government," *id.*, where it needs to show by a preponderance of the evidence "that each individual act constituting a search or seizure under the Fourth Amendment was reasonable." *United States v. Ritter*, 416 F.3d 256, 261 (3d Cir. 2005); *see United States v. Matlock*, 415 U.S. 164, 178 n.14 (1974) (indicating applicable burden is preponderance of the evidence).

In this case, Defendant has shown that his apartment was subjected to a search based on an anticipatory warrant that did not specify his address.  It was further shown that the package which led to the search of his apartment was seized without a warrant. Defendant must first establish he has standing to challenge the subject search under the Fourth Amendment. The Government then has the burden to show, by a preponderance of the evidence, that the events were reasonable under the Fourth Amendment.

## B.     Standing

The Government first contends that Defendant lacks standing under the Fourth Amendment to challenge the search and seizure of the package. The Court disagrees.

A defendant may only assert a Fourth Amendment claim if he has a reasonable expectation of privacy in the searched package. *See Rakas v. Illinois*, 439 U.S. 128, 143 (1978). To establish a reasonable expectation of privacy, the Court must determine if the defendant had a subjective expectation of privacy in the object searched and if that expectation was reasonable and legitimate under the circumstances. *United States v. Zavala*, 2003 WL 431636, *1 (E.D. Pa. Feb. 20, 2003) (internal citations omitted).

In this case, while the package containing the mini fridge of cocaine was not addressed to nor shipped to Defendant's apartment, the manner of delivery and receipt shows Defendant had a subjective expectation of privacy over it. Upon agreement between Defendant and the person

8

residing at the subject residence, in which monetary consideration was given, the package was shipped using a fictitious name with the intention that Defendant would ultimately collect it. *See* Suppression Hr'g Tr, May 14, 2024, 32:18-25, 33:1-2, 72:16-20. Pursuant to this agreement, Defendant was the only person to exhibit control over the package, as others stepped over it upon arrival. *Id.* at 45:1-5. At all times, the package was intended for receipt by Defendant, and he took possession of it immediately upon arrival. *Id.* at 45:10-14. These factors show Defendant believed he had a privacy right over the package.

The Court next looks to whether that expectation of privacy was reasonable and legitimate under the circumstances. The Third Circuit has previously acknowledged that people may possess a reasonable expectation of privacy while using a fictitious name. *See United States v. Pettiway*, 429 F. App'x 132, 135 n.5 (3d Cir. 2011) (citing *United States v. Villarreal*, 963 F.2d 770, 774 (5th Cir. 1992)). Further, courts in this Circuit have acknowledged that when a defendant arrives at the address of another person for the purpose of collecting a package and takes steps to secure that package, they have a reasonable expectation of privacy. *See United States v. Moorer*, 2001 U.S. Dist. LEXIS 23949, *8 (D. Del. Oct. 9, 2001). In *Moorer*, the court found that even though the defendant failed to make arrangements with the owner of the subject residence, failed to insure no one else would open the package, and never determined how the package would be transferred, he still had standing to contest the search. *Id.* at *8-10.

Here, Defendant not only arranged for delivery and receipt at the pertinent location, but he also paid for such arrangements. Defendant effectively created a license to use the property as his

own for the limited purpose of obtaining exclusive possession over the subject package. Therefore, he had a reasonable expectation of privacy over said package and standing for this motion.[7]

### C.    Seizure of the Package

Defendant contends the Government illegally seized the package without reasonable suspicion and all fruits of the seizure, including those that resulted from the search of the package and the search of Defendant's apartment, should be suppressed. The Government asserts Inspector Lynch acted upon reasonable suspicion to remove the package from circulation.

It is well established that "postal authorities may seize and detain mailed items for a reasonable amount of time if they have reasonable suspicion of criminal activity. *See United States v. Ramos*, 826 Fed. Appx. 131, 134 (3d Cir. 2020) (internal citations omitted). Reasonable suspicion is a low bar and requires "only a particularized and objective basis for suspecting legal wrongdoing," which may "fall considerably short of satisfying a preponderance of the evidence standard." *Id.* at 134 (internal citations and quotations omitted). The Third Circuit further clarified that district courts must analyze the totality of the circumstances to determine if the reasonable suspicion standard was met. *See Generally United States v. Colon*, 386 F. App'x 229, 231 (3d Cir. 2010) (citing *United States v. Arvizu*, 534 U.S. 266, 273–74 (2002)). The Third Circuit also stated that "[a]lthough law enforcement officers may not act on a mere hunch to establish reasonable suspicion, they may draw on their own experience and specialized training to make inferences

---

[7]        The Government argues the holding in *Zavala* necessitates the conclusion that Defendant lacks standing. 2003 WL 431636. However, since the decision in that case, the Third Circuit has held that a Defendant can have a legitimate expectation of privacy while using an alias. *See Pettiway*, 429 F. App'x at 135 n.5. The Circuit has differentiated between packages using an alias from using the name of another. *Id.* Here, there is no evidence before the Court that "Virginia Garcia" was anything but a fictitious entity.

from and deductions about the cumulative information available to them that might well elude an untrained person." *Id.* (internal citations and quotations omitted).

In the instant case, Inspector Lynch relied upon numerous factors to determine there was reasonable suspicion to seize the package. As background, his training and experience showed individuals have historically used the mail system to ship cocaine, and Puerto Rico has been a known origin for shipments of drugs. Suppression Hr'g Tr., May 14, 2024 at 28:11-17, 25, 29:1-3. Here, he operated off a watch list that included 3346 Tyson Ave. as a suspect location, and he had knowledge of prior deliveries of illegal substances conducted at other addresses on this list. *Id.* at 25:3-18, 25, 26:1-13. When Agent Lynch received an alert that the package was inbound from Puerto Rico to 3346 Tyson Ave, he noted that it was sent priority mail, which he knew was a common way to ship drugs, as it provides both sender and recipient with an easy method to track the package. *Id.* at 27-29. These details, couched with the ongoing investigation, provided reasonable suspicion for the initial detention.

Further justifying the extended detention, after postal inspectors investigated the parcel, it was determined that the named recipient was not associated with the intended address, and the named sender was not associated with the sender's address. *See id.* at 32:18-25, 33:1-2. Based on his training and experience, he knew that drug traffickers often use a fictitious name and/or address to avoid detection. *See* Gov't Ex. 2. Although Defendant attempts to minimize each of these factors, when taken together they amount to more than reasonable suspicion. *See Van Leeuwen*, 397 U.S. at 252 (finding the nature and weight of the packages, the fictitious return address, and the license plates of respondent who made the mailings enough to detain the package).[8]

---

[8]      Additionally, the Court finds the timing of the detention reasonable. The package was originally scheduled to arrive on November 3, 2023, but even with the seizure, the package was delivered on November 2, 2023. Gov't Ex. 1; *See* Suppression Hr'g Tr., May 14, 2024, 44:2-6.

**D.      Search of the Package**

Defendant next contends the dog sniff was insufficient to obtain a search warrant for the package, as the affidavit contained inadequate information as to the dog's reliability. The Court disagrees.[9]

"A reviewing court must determine only that the magistrate judge had a 'substantial basis' for concluding that probable cause existed to uphold the warrant." *United States v. Whitner*, 219 F.3d 289, 296 (3d Cir. 2000) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983). The magistrate's determination should be afforded "great deference." *See id.* (quoting *Gates,* 462 U.S. at 6). In making this determination, the court may consider only the facts that were presented before the magistrate and not additional information found in the record. *See United States v. Miknevich*, 638 F.3d 178, 181-82 (3d Cir. 2011) (citations omitted). However, this does not mean that the court should act as a "rubber stamp" for the magistrate's decisions. *United States v. Tehfe*, 722 F.2d 1114, 1117 (3d Cir. 1983) (citations omitted).

Here, the facts and circumstances described in the affidavit were more than sufficient to establish the reliability of the special agent and drug detection K9. *See Florida v. Harris*, 568 U.S. 237, 246-47 (2013) (finding certification or training program completion satisfactory to presume probable cause to search). It provided that both the agent and dog were certified on a yearly basis, complete eight hours maintenance training every month, participated in the United States Police

---

[9]      In a footnote within Defendant's Reply to the Government's Response, he states he abandons this argument. ECF No. 29 at 2 n. 1. Instead, he asserts there was insufficient probable cause to support the dog sniff "search" and because the dog sniff "search" was the substantial basis of probable cause for the parcel, the parcel search was fruit of the poisonous tree. This argument is discussed below. For the purposes of clarity, the Court addresses the merits of the original argument as well.

K9 Association Certifications, and detailed the specific substances they are certified in. Gov't Ex. 2 at 3-4.

Further, while the alert of the drug dog is sufficient to establish probable cause to search, the affidavit also included a detailed description of the suspicious facts and circumstances and Inspector Lynch's inferences and conclusions based on his training and experience. *See id.*; *see also United States v. Fisher,* No. 01-715-01, 2022 U.S. Dist. LEXIS 6652, *19 (E.D. Pa. April 15, 2022) ("It is well settled that the positive alert by a sufficiently trained and reliable drug-sniffing dog, on its own, constitutes probable cause for issuance of a search warrant.) (internal citations and quotations omitted). Based upon all of these factors, the Court finds the Magistrate had a substantial basis for concluding the warrant was supported by probable cause.

### E.      Investigatory Sniff by K9

Defendant's next argument challenges the legality of K9 investigatory sniffs. Specifically, Defendant argues that because K9s are trained to detect marijuana, but not to distinguish between illegal and legal products containing CBD, THC, and/or hemp, the "sniff" from the K9 qualifies as a search subject to the Fourth Amendment. ECF No. 27 at 1.

The Supreme Court, in establishing the K9 exception, has found that a dog sniff "generally does not implicate legitimate privacy interest" and therefore does not constitute a search pursuant to the Fourth Amendment. *Illinois v, Caballes*, 543 U.S. 405, 409 (2005). This is because "the manner in which information is obtained through this investigative technique is much less intrusive than a typical search," as the sniff is designed to disclose only contraband. *U.S. v. Place*, 462 U.S. 696, 707 (1983). This remains the applicable law in this Circuit, and the Court does not find justification to set aside long-standing Supreme Court and Third Circuit precedent. *See United States v. Plancarte*, No. 22-CR-64, 2023 U.S. Dist. LEXIS 90338, *4 (W.D. Wis. May 23, 2023)

("The uncertainty [regarding whether the legalization of THC products might prompt the Supreme Court to revisit a dog sniff] does not justify a district court setting aside long-standing…precedent, much less to do so retroactively…").

While the Court rejects Defendant's argument based on the precedent set by the Supreme Court, it is further guided by the Seventh Circuit's opinion on the matter. The Seventh Circuit is currently the only Circuit to address whether a dog sniff from a K9 that cannot distinguish between illegal marijuana and related legalized products is a search under the Fourth Amendment. *See United States v. Plancarte*, 105 F. 4th 996, 1000 (7th Cir. 2024). The defendant in *Plancarte*, like Defendant here, asserted that the legalization of products containing CBD, THC, and/or hemp analogize dog sniffs to thermal imaging technology inside the home, which constitutes a search under the Fourth Amendment. *Id.*; *see Kyllo v. U.S.*, 533 U.S. 27, 40 (2001). However, the court accurately identified the missing factor in this comparison – the private nature of the home. *Plancarte*, 105 F.4th at 1000. The court explained "dog sniff jurisprudence itself sets apart dog sniffs occurring in public areas from those that involve homes or other private places." *Id.* (internal citations omitted). When a dog sniff occurs in a public place, as it did here, "the Fourth Amendment's core concern of protecting the privacy of the home" is not implicated. *Id.* Therefore, these sniffs are not the same as taking thermal images of the home, and do not necessitate the same constitutional protections.

Additionally, as stated in *Plancarte*, "courts have long acknowledged and tolerated the imperfection of drug detection dogs." *Id.* at 1001 (detailing numerous cases accepting dogs with varying accuracy rates). It is true that with the addition of legal substances derived from the same

14

substances as illicit drugs, there could be more "false" detections from trained K9s.[10] The Court finds the long-standing precedent upholding the K9 exception compelling and does not find it is the district court's place to stray from this analysis.

The evidence supports that Mizu was a certified and regularly trained drug detection dog. Mizu's sniff of the package, which occurred outside the home, does not disrupt a reasonable expectation of privacy. Therefore, the sniff was not a search subject to further Fourth Amendment analysis.

### F.    The Anticipatory Warrant

Finally, Defendant contends the anticipatory search warrant was an unconstitutional general warrant that lacked probable cause to search his house, and because the warrant failed to particularly describe the place to be searched and was not supported by probable cause, the evidence must be suppressed. The Court disagrees.

#### 1.    Facial Invalidity

The Fourth Amendment provides "…no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized." U.S. Const. amend. IV. The scope of the search must be set out with particularity at the time of issuance. *United States v. Fattah*, 858 F.3d 801, 819 (3d Cir. 2017). The particularity requirement has been described as the "touchstone" of the warrant, and "a lack of particularity cannot be characterized as a mere technical mistake…" *United States v. Wright*, 493 Fed. Appx. 265, 268, 270 (3d Cir. 2012).

---

[10]    The Court acknowledges that to a certain degree, these detections will not be false at all. A dog trained to alert to both illegal marijuana and related legal products will in fact correctly alert to such products based on its training. It is "false" as it relates to whether it accurately identifies illegal contraband. However, the Court additionally notes that marijuana remains a controlled substance under federal law.

Here, the warrant provided a specific address to be searched, but also included "any other location where subject parcel is brought." Gov't Ex. 3. Ultimately, it was not the particularly described location where the police conducted their search, but Defendant's house, which was not identified or described in the warrant. The warrant fails the particularity requirement of the Fourth Amendment, as it simply did not describe the place to be searched at the time of issuance. The Court acknowledges that Inspector Lynch had probable cause to believe the package would move but did not have probable cause regarding where the receiver would transport it. While the reasoning for including "any location" is sound, it does not change the particularity analysis. The warrant was facially invalid in violation of the Fourth Amendment.

## 2.      Good Faith

"Although the exclusionary rule was designed to deter Fourth Amendment violations, the heavy social cost of suppressing evidence counsel against its indiscriminate application." *United States v. Wright*, 777 F.3d 635, 638 (3d Cir 2015) (internal citations omitted); *see also Herring v. United States*, 555 U.S. 135, 141 (2009) ("The principal cost of applying the rule is, of course, letting guilty and possibly dangerous defendants go free– something that offends basic concepts of the criminal justice system.") (internal citations and quotations omitted). "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring*, 555 U.S. at 144. Therefore, when an officer acts in good faith reliance on a subsequently invalidated search warrant, the exclusionary rule is not applied. *United States v. Henry*, No. 21-3254, 2023 U.S. App. LEXIS 7943, *6 (3d Cir. 2023).

Typically, when a warrant is deemed facially invalid for failing to meet the Fourth Amendment's particularity requirement, the good-faith exception is unavailable. This is because

"the officers involved are usually at least grossly negligent." *Wright*, 777 F.3d at 639 (internal citations and quotations omitted). However, the Third Circuit has clarified that this is not a categorical rule and "[i]n examining the totality of the circumstances, we consider not only any defects in the warrant but also the officer's conduct in obtaining and executing the warrant and what the officer knew or should have known." *Id.* Therefore, "even if a warrant is facially invalid, an assessment of the officers' culpability and the value of deterrence may counsel against suppression." *Id.*

If an officer's conduct was not at least grossly negligent, and instead, was objectively reasonable, the court may determine that the invalidity does not require suppression. *Id.* "[A]n officer's knowledge and experience bear on whether it was objectively reasonable for that officer to believe the search was legal." *Id.* (internal citations and quotations omitted). Additionally, "the Supreme Court has held that the exclusionary rule does not apply when an officer 'reasonably relie[s] on the [m]agistrate's assurance that the warrant contain[s] an adequate description…and [i]s therefore valid.'" *Id.* at 639-40 (quoting *Groh v. Ramirez*, 540 U.S. 551, 564 (2004)).

The Third Circuit has described gross negligence as "the want of even scant care and the failure to exercise even that care which a careless person would use." *Id.* at 640 (internal citations and quotations omitted). To determine whether the officer's conduct reaches the level of gross negligence, versus mere negligence, the Third Circuit has evaluated the "probable consequences of the failure to exercise care." *Id.* This led the court to evaluate "(1) the extent to which the violation in this case undermined the purposes of the Fourth Amendment and (2) what the Government gained from the violation." *Id.*

### a.    Negligence

The Court first notes that Defendant does not argue that Inspector Lynch deliberately violated his Fourth Amendment rights, but instead asserts the warrant "was so facially deficient that officers' reliance on the warrant…was not reasonable." ECF No. 21 at 30. While Inspector Lynch is a trained and seasoned officer, this investigation presented unique circumstances. While contraband and evidence of a crime has long been transportable, it has not always been trackable via GPS device to the degree that allows an officer to ascertain its location with near certainty before conducting a search of its final location. The guidance on whether the location and items to be seized needs to be defined with absolute certainty, or applied with a more flexible approach, has been sparce in this area. *See People v. Bui*, 885 N.E.2d 506 (2008) (finding no general warrant when "any other location" was based on affidavit statements that traffickers could transport packages); *United States v. Werdene*, 883 F.3d 204, 217 (3d Cir. 2018) (finding no particularity violation when description for places to be searched was "activating computers" for users who log into device at a future time). As discussed below, these circumstances limited the discretion of the officers conducting this search and did not violate the Fourth Amendment's primary concern regarding granting officers unfettered discretion. *See Andresen v. Md.*, 427 U.S. 463, 480 (1976). While the Court finds that describing the ultimate location in uncertain and changing terms does not meet the requirements of the Fourth Amendment, it does not find Inspector Lynch grossly negligent in his description. He reasonably relied on the Magistrate's finding of probable cause and reasonably believed the guidelines provided by the GPS tracker, and only searching the location it entered, satisfied the Fourth Amendment's particularity requirement.[11]

---

[11] Inspector Lynch testified at the May 14, 2024, suppression hearing, where the Court found him credible.

####         b.         Purposes of the Fourth Amendment's Particularity Requirement

The particularity requirement of the Fourth Amendment serves a number of purposes. *Wright*, 777 F. 3d at 640. "First, it provides 'written assurance that the [m]agistrate actually found probable cause to search for, and to seize, every item mentioned'" and to search each specified place. *Id.* (quoting *Groh*, 540 U.S. at 560). "Second, it prevents general searches by confining the discretion of officers and authorizing them to [search the specified place]." *Id.* (internal citations and quotations omitted). Lastly, it "informs the subject of the search of the lawful authority of the executing officer, his need to search, and the limits of his power to search." *Id.* (internal citations and quotations omitted).

Here, it is clear the Magistrate found there was probable cause to search the specified address and also probable cause to search the location the parcel would eventually enter. The Magistrate just did not know where that location would be. It is permissible for a magistrate to determine that there is now probable cause that contraband will be at a specified location when the warrant is executed. *See United States v. Grubbs*, 547 U.S. 90, 96 (2006) (permitting anticipatory warrants when magistrate finds "(1) that is it *now probable* that (2) contraband, evidence of a crime, or a fugitive *will be* on the described premises (3) when the warrant is executed."). Of course, as described above, the issue remains that the location was not specified at the time of issuance. However, the Court finds that the purpose of ensuring that the Magistrate actually found probable cause is still met. The locations where the package would go, though unknown at the time of issuance, were limited and ultimately ascertainable. The Magistrate knew, based off Inspector Lynch's affidavit, that he would know with certainty whether the package was in a particular location and whether it was opened. Therefore, the Magistrate knew there would be

probable cause for each searched location. The problem is with the timing of the warrant, not the ultimate search.[12]

Further, this warrant, while lacking in particularity, certainly did not grant officers unfettered discretion. The affidavit informed the Magistrate that the agents would be monitoring the GPS device to ensure they would be able to identify the appropriate location and would be alerted when the Parcel was opened inside its ultimate location. The agents had virtually no discretion regarding where to search, as they could only search the place(s) the parcel entered. While this place was theoretical and undefined at the time of the warrant's issuance, it was not discretionary. The Magistrate knew that at the time of the search, the agents would be acting based on probable cause.

The third element, while more appropriate for analysis regarding the particularity of the items to be seized, also was not violated by the invalidity of this warrant. The warrant informed the subject of the search of the scope of the search, the place where the parcel entered. Further, it limited the agent's power to search, as described above, only to the location of the parcel. Therefore, the Court finds the purposes of the Fourth Amendment particularity requirement were not undermined by the invalidity of the warrant.

### c.    Government Gain

Here, it is indisputable that the Government gained relevant evidence from the invalid warrant. Without the broad "any location" term in the warrant, the agents would have been unable to enter and search Defendant's residence. While this consideration weighs in favor of suppression, the Court finds the social cost of excluding the evidence outweigh this and any deterrent factors.

---

[12]    Notably, if Inspector Lynch returned to the Magistrate once the parcel entered the subject residence, the Court has no reason to believe the Magistrate would not have issued a third warrant.

The Court declines to grant the instant motion because of the Government's failure to comply with the particularity requirement of the Fourth Amendment.

### C.    Anticipatory Warrant Requirements

An anticipatory search warrant is "a warrant based upon an affidavit showing probable cause that at some future time (but not presently) certain evidence of crime will be located at a specified place." *United States v. Grubbs*, 547 U.S. 90, 94 (2006) (internal citations and quotations omitted). Unlike traditional warrants, which rely on current probabilities, the probable cause for an anticipatory warrant hinges on the likelihood that criminal evidence will be discovered at a certain place once a specified condition precedent or "triggering condition" occurs. *See id.* at 96.

"As with all warrants, there must be a sufficient nexus between the contraband to be seized and the place to be searched before an anticipatory warrant can be issued." *United States v. Loy*, 191 F.3d 360, 365 (3d Cir. 1999). "To satisfy the nexus requirement, it is not enough that the anticipatory search warrant be conditioned on the contraband arriving at the designated place." *Id.*

Instead, to issue a valid anticipatory warrant, the magistrate must determine (1) whether there is probable cause to believe that the contraband will be at the designated search location when the warrant is executed, and (2) whether there is probable cause to believe that the condition precedent will actually occur. *Grubbs*, 547 U.S. at 97; *see also Loy*, 191 F.3d at 364. The second element insures that "an anticipatory warrant [cannot] be issued for every house in the country, authorizing search and seizure if contraband should be delivered." *See Grubbs*, 547 U.S. at 96. Instead, the magistrate judge must analyze the probability of whether the condition will occur, and "thus that a proper object of seizure will be on the described premises." *Id.* "The supporting affidavit must provide the magistrate with sufficient information to evaluate both aspects of the probable-cause determination." *Id.* at 97.

"When the warrant application indicates that there will be a controlled delivery of contraband to the place to be searched, the nexus requirement of probable cause is usually satisfied." *Loy*, 191 F.3d at 365. However, where "the delivery of the contraband is to a place other than the one to be searched…the warrant application must present additional facts establishing that the contraband will be taken to the place designated for the search." *Id.* (internal citations and quotations omitted).

Here, Inspector Lynch proffered in the affidavit for the anticipatory warrant and tracking device that drug packages are often mailed to addresses that recipients are not associated with and immediately transported to another location upon receipt. Gov. Ex. 3 at 6-7. Further, his investigation in this case revealed that the name on the subject parcel was not associated with the delivery address. *Id.* at ¶ 9. Since Inspector Lynch could not predict the final location of the package, he sought to install a GPS tracking device. *Id.* at 7. Ultimately, he requested to search any location where the package was brought. *Id.* at 7-8.

The Magistrate found sufficient probable cause that the package would be moved to another location, Inspector Lynch would be able to ascertain that location prior to conducting a search, and therefore, the contraband would be at the specific location at the time the warrant was executed. As detailed above, the ultimate location was not particularly described at the time the warrant was issued, and therefore violated the Fourth Amendment. However, for the same reasons discussed above, this violation does not warrant exclusion of evidence.

Further, based on the expertise and experience of Inspector Lynch, the Magistrate found there was probable cause that the condition precedent, the parcel entering another location, would

occur. The affidavit of probable cause provided the Magistrate with a substantial basis for believing that the warrant was supported by probable cause.[13]

**III.        CONCLUSION**

For the foregoing reasons, the Motions to Suppress are **DENIED.**

An appropriate order follows.

BY THE COURT:


*/s/ John M. Gallagher*
JOHN M. GALLAGHER
United States District Court Judge

---

[13]        At this stage, the Court does not conduct a *de novo* review and reach its own determination of whether probable cause existed. Instead, it is constrained to determine only whether the Magistrate has a substantial basis for its conclusion that the warrant was supported by probable cause. *See Loy*, 191 F.3d at 365.